# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2015-KA-00224-SCT

*PERRY ARMSTEAD*

*v.*

*STATE OF MISSISSIPPI*

DATE OF JUDGMENT:                01/29/2015
TRIAL JUDGE:                     HON. LEE J. HOWARD
TRIAL COURT ATTORNEYS:           LINDSAY CLEMONS
                                 MARK WILLIAMSON
COURT FROM WHICH APPEALED:       OKTIBBEHA COUNTY CIRCUIT COURT
ATTORNEYS FOR APPELLANT:         OFFICE OF THE STATE PUBLIC
                                 DEFENDER
                                 BY: ERIN ELIZABETH PRIDGEN
                                      GEORGE T. HOLMES
ATTORNEY FOR APPELLEE:           OFFICE OF THE ATTORNEY GENERAL
                                 BY:  LADONNA C. HOLLAND
DISTRICT ATTORNEY:               FORREST ALLGOOD
NATURE OF THE CASE:              CRIMINAL - FELONY
DISPOSITION:                     AFFIRMED - 08/11/2016
MOTION FOR REHEARING FILED:
MANDATE ISSUED:

**EN BANC.**

**WALLER, CHIEF JUSTICE, FOR THE COURT:**

¶1.     Perry Armstead was convicted of two counts of sale of cocaine and was sentenced as a habitual offender and subsequent drug offender to thirty-two years' imprisonment without the possibility of parole.  Armstead appeals his convictions to this Court, arguing that the was denied his constitutional right to confront the witnesses against him.  Finding no error, we affirm Armstead's convictions and sentences.

## FACTS & PROCEDURAL HISTORY

¶2. In April of 2013, the Oktibbeha County Sheriff's Department arranged two controlled purchases of cocaine from Perry Armstead. Confidential informant Shondra Hill was involved in both transactions. Hill initially was reluctant to act as an informant because she previously had been in a romantic relationship with Armstead, so Sergeant Steven Gant, who was in charge of the operation, enlisted Carrington Butler to act as a secondary informant. Sergeant Gant's plan was to have Hill introduce Armstead to Butler so that Armstead would be willing to sell drugs to Butler.

¶3. On April 16, 2013, Hill and Butler made their first purchase from Armstead. Hill and Butler were searched before the meeting, and Hill was fitted with an audiovisual surveillance device. Hill and Butler attempted to meet Armstead at the Camelot Apartments in Starkville, but Armstead refused to meet with Butler. Butler stayed outside while Hill went inside an apartment with Armstead. Once inside, Hill mentioned a "50," which meant that she wanted half a gram of cocaine. Armstead then gave Hill a plastic bag containing a substance later identified as cocaine in exchange for fifty dollars. After this exchange, Hill and Butler met with Sergeant Gant and handed over the substance they had purchased from Armstead.

¶4. Two days later, on April 18, 2013, Hill and Butler arranged a second meeting with Armstead. Prior to this meeting, Hill and Butler were searched again, and Hill again was outfitted with surveillance equipment. Hill and Butler tried to meet with Armstead at a house in the Sunset Community in Starkville, but Armstead refused to meet with Butler yet again. Outside the house, Armstead handed Hill an envelope containing cocaine. In exchange, Hill

2

gave Armstead forty dollars. Hill and Butler then returned Sergeant Gant and handed over the substance.

¶5. Sergeant Gant delivered the substances purchased by Hill and Butler to the Columbus Police Department's forensics lab for testing. The substances purchased on both occasions were determined to be cocaine.

¶6. On July 10, 2014, Armstead was indicted with two counts of sale of less than two grams of cocaine, in violation of Section 41-29-139 of the Mississippi Code. Armstead's indictment charged him as a habitual offender and a subsequent drug offender.[1] Armstead's trial commenced on January 28, 2015. Both Sergeant Gant and Hill testified that Armstead had sold cocaine to Hill on April 16 and 18, 2013. The video recordings of both transactions were played for the jury, as well. The substance Hill purchased from Armstead on April 16, 2013, was admitted into evidence as State Exhibit 2. The substance purchased on April 18, 2013, was admitted as State Exhibits 6 and 7.

¶7. Claudette Gilman, a forensic scientist with the Columbus City Police Department, testified for the State and was accepted as an expert witness in the field of forensic science specializing in drug analysis. Gilman was one of the analysts who tested the substances Armstead sold to Hill. Gilman personally tested State Exhibits 6 and 7, and she acted as a "technical reviewer" of the testing procedures on State Exhibit 2. Gilman discussed the specific tests she performed on State Exhibits 6 and 7 and opined that State Exhibits 6 and 7 contained a total of .39 grams of cocaine. She also explained her procedure for reviewing

_____

[1] Armstead's indictment alleged that he had two prior convictions for the sale of cocaine.

3

the work of the analyst who tested State Exhibit 2, and she testified that she agreed with the analyst's conclusion that State Exhibit 2 contained .37 grams of cocaine. Gilman testified that the tests performed on the substances in question were reliable and repeatable and were the types of procedures generally performed by forensic analysts in identifying controlled substances. Armstead did not object at any point during Gilman's testimony, and he did not cross-examine her about the fact that she had not personally tested State Exhibit 2. The forensic reports containing the results of the testing on State Exhibits 2, 6, and 7 were not admitted into evidence.

¶8. At the conclusion of the trial, the jury found Armstead guilty of both counts of sale of cocaine. Armstead was sentenced, as a habitual offender under Section 99-19-81 of the Mississippi Code and a subsequent drug offender under Section 41-29-147 of the Mississippi Code, to sixteen years' imprisonment without the possibility of parole for each count. The trial court ordered Armstead's sentence for Count II to run consecutively to the sentence for Count I.

¶9. Armstead now appeals his convictions to this Court, arguing that the trial court erred in allowing to Gilman to testify concerning the tests performed on State Exhibit 2.

## STANDARD OF REVIEW

¶10. This Court generally reviews issues concerning the admission or exclusion of evidence for an abuse of discretion. *Williams v. State*, 991 So. 2d 593, 597 (Miss. 2008) (citations omitted). However, constitutional questions are reviewed de novo. *Smith v. State*, 25 So. 3d 264, 267 (Miss. 2009).

4

**DISCUSSION**

**Whether Gillman's testimony violated Armstead's constitutional right to confrontation.**

¶11.    Armstead argues that the State violated his rights under the Confrontation Clause of the Sixth Amendment to the United States Constitution by allowing Gilman to testify concerning State Exhibit 2, since she did not personally perform the testing of that substance. Armstead did not raise this issue at trial.  In fact, he did not object at any point during Gilman's testimony. Accordingly, this issue is procedurally barred, and this Court is constrained to review Armstead's arguments under the plain-error doctrine. *See **Debrow v. State***, 972 So. 2d 550, 553 (Miss. 2007) (reviewing Confrontation Clause challenge for plain error, where the defendant did not raise the issue at trial).  "The plain error doctrine requires that there be an error and that the error must have resulted in a manifest miscarriage of justice."  ***Williams v. State***, 794 So. 2d 181, 187 (Miss. 2001) (citing ***Gray v. State***, 549 So. 2d 1315, 1321 (Miss. 1989)), *overruled on other grounds by **Brown v. State***, 995 So. 2d 698, 703 (Miss. 2008). "To determine if plain error has occurred, we must determine 'if the trial court has deviated from a legal rule, whether the error is plain, clear or obvious, and whether the error has prejudiced the outcome of the trial.'" ***McGee v. State***, 953 so. 3d 211, 215 (Miss. 2007) (quoting ***Cox v. State***, 793 So. 2d 591, 597 (Miss. 2001)).  "Plain-error review is properly utilized for 'correcting obvious instances of injustice or misapplied law.'" ***Smith v. State***, 986 So. 2d 290, 295 (Miss. 2008) (quoting ***Newport v. Fact Concerts***, 453 U.S. 247, 256, 101 S. Ct. 2748, 69 L. Ed. 2d 616 (1981)).

5

¶12.  Defendants in criminal cases have a fundamental constitutional right to be confronted with witnesses against them.  U.S. Const. amend. VI; Miss. Const. art. 3, § 26 (1890). "The right of a criminal defendant . . . to cross examine the witnesses against him is at the heart of the confrontation clause, in that cross-examination is 'the principal means by which the believability of a witness and the truth of his testimony are tested.'" *Lanier v. State*, 533 So. 2d 473, 488 (Miss. 1988) (quoting *Davis v. Alaska*, 415 U.S. 308, 316, 94 S. Ct. 1105, 39 L. Ed. 2d 347 (1974)).  Historically, the United States Supreme Court held that out-of-court statements did not offend the Confrontation Clause if they fit "within a firmly rooted hearsay exception" or bore "particularized guarantees of trustworthiness." *Ohio v. Roberts*, 448 U.S. 56, 66, 100 S. Ct. 2531, 2539, 65 L. Ed. 2d 597 (1980).  However, in *Crawford v. Washington*, 541 U.S. 36, 68, 124 S. Ct. 1354, 1374, 158 L. Ed. 2d 177 (2004), the Court abandoned *Roberts* and held that an out-of-court "testimonial" statement of a witness who is absent from trial may be admitted into evidence only if the declarant is unavailable and the defendant had a prior opportunity to cross-examine the declarant. "Testimonial statements are those reasonably expected to be used 'prosecutorally,' such as confessions, affidavits, custodial police examinations, and depositions." *Rubenstein v. State*, 941 So. 2d 735, 754 (Miss. 2006) (quoting *Crawford*, 541 U.S. at 51-52).

¶13.  While the *Crawford* Court did not exhaustively define the class of out-of-court statements which could be considered testimonial, the Supreme Court has had several opportunities to clarify *Crawford* as it applies to forensic evidence.  First, in *Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 308, 129 S. Ct. 2527, 174 L. Ed. 2d 314 (2009), a drug

trafficking case, the prosecution offered into evidence sworn "certificates of analysis" indicating that the substances seized from the defendant were cocaine. Under state law, certificates of this type were admissible without live testimony as "prima facie evidence of the composition, quality, and the net weight of the narcotic." *Id.* Thus, the analysts who tested the substances were not called to testify at trail. *Id.* The Supreme Court found that the analysts' certificates fell within the "core class of testimonial statements" described in *Crawford*, as they contained "the precise testimony the analyst would be expected to provide if called at trial." *Id.* at 310. Thus, the analysts were witnesses subject to the Confrontation Clause, and the prosecution could not "prove its case via *ex parte* out-of-court affidavits" in lieu of in-court testimony. *Id.* at 329. Because the prosecution made no showing that the analysts were unavailable and the defendant was not given an opportunity to cross-examine them, the Court reversed the defendant's conviction and remanded the case for a new trial. *Id.*

¶14.    Next, in *Bullcoming v. New York*, 131 S. Ct. 2705, 2709, 180 L. Ed. 2d 610 (2011), an aggravated DUI case, the prosecution admitted into evidence a lab report indicating that the defendant's blood-alcohol level was above the legal limit at the time of the crime. The lab report had been created by an analyst named Curtis Caylor, who was on unpaid leave at the time of trial. *Id.* at 2711-12. Accordingly, at trial, the prosecution admitted the report through the "surrogate testimony" of another analyst named Gerasimos Razatos, who had no involvement in the preparation of the report. *Id.* at 2712. The United States Supreme Court found that the admission of the report under these circumstances violated the Confrontation

7

Clause. *Id.* at 2710. The Court noted that the Razatos neither observed nor reviewed Caylors's analysis and, therefore, had no "independent opinion" concerning the information contained in the lab report. *Id.* at 2712. The prosecution did not attempt to assert that Caylor was unavailable for trial, nor could Razatos explain the reason for Caylor's absence. *Id.* at 2715-16. As such, the defendant could not cross-examine Razatos as to whether Caylor's absence was the result of "incompetence, evasiveness, or dishonesty[.]" *Id.* at 2715. The Court also found that "the formalities attending the 'report of blood alcohol analysis' are more than adequate to qualify Caylor's assertions as testimonial." *Id.* at 2717. "In short, when the State elected to introduce Caylor's certification, Caylor became a witness Bullcoming had the right to confront." *Id.* at 2716.

¶15. Under *Melendez-Diaz* and *Bullcoming*, forensic reports created specifically to serve as evidence against an accused at trial are among the "core class of testimonial statements" governed by the Confrontation Clause. *Melendez-Diaz*, 129 S. Ct. at 2532; *Bullcoming*, 131 S. Ct. at 2717. The Confrontation Clause prohibits the introduction of these testimonial documents through the "surrogate testimony" of a witness who had no involvement in the creation of those documents. *Bullcoming*, 131 S. Ct. at 2709. But the facts of this case are distinguishable from *Melendez-Diaz* and *Bullcoming*. In *Melendez-Diaz*, no witness was offered to support the conclusions included in the forensic report. And in *Bullcoming*, a forensic report was admitted into evidence through the testimony of an analyst who had no involvement in the report's creation. Here, on the other hand, Gilman actually tested one of the substances Armstead sold to Hill, and she served as the reviewer for the analyst who

8

tested the substance contained in State Exhibit 2. Justice Sotomayor suggested in her separate opinion in **Bullcoming** that the testimony of an analyst with *some* level of secondary involvement in the underlying testing could be sufficient to satisfy the defendant's right to confrontation, though she did not address the degree of involvement which would permit meaningful cross-examination:

> [T]his is not a case in which the person testifying is a supervisor, reviewer, or someone else with a personal, albeit limited, connection to the scientific test at issue. Razatos conceded on cross-examination that he played no role in producing the BAC report and did not observe any portion of Curtis Caylor's conduct of the testing . . . . The court below also recognized Razatos' total lack of connection to the test at issue . . . . It would be a different case if, for example, a supervisor who observed an analyst conducting a test testified about the results or a report about such results. We need not address what degree of involvement is sufficient because here Razatos had no involvement whatsoever in the relevant test report.

**Bullcoming**, 131 S. Ct. at 2722 (Sotomayor, J., concurring in part). A majority of the United States Supreme Court has yet to provide an answer to the scenario posed by Justice Sotomayor. However, this Court has directly addressed this issue on several occasions.

¶16. Prior to **Crawford**, this Court held that a forensic analyst who was involved in the preparation of a particular report, but did not perform the underlying testing, could testify as to the results of the testing without violating the Confrontation Clause. **McGowen v. State**, 859 So. 2d 320 (Miss. 2003). In **McGowen**, a capital-murder case, the prosecution admitted various forensic reports into evidence through the testimony of a forensic biologist who had reviewed the procedures of the analyst who had actually tested the evidence. **Id.** at 326. The defendant argued that the admission of these reports violated his rights under the Confrontation Clause because the testifying witness had not personally performed the testing.

9

*Id.* This Court rejected the defendant's argument, finding that the testifying witness was "not so far removed from the process as to be reduced to the level of a records custodian." *Id.* at 339 (quoting *Adams v. State*, 794 So. 2d 1049, 1057-58 (Miss. Ct. App. 2001). This Court then held that "when the testifying witness is a court-accepted expert in the relevant field who participated in the analysis in some capacity, such as by performing procedural checks, then the testifying witness's testimony does not violate the defendant's Sixth Amendment rights." *Id.*

¶17.    This Court has continued to follow the rationale of *McGowen* even after *Melendez-Diaz* and *Bullcoming* were decided. For example, in *Conners v. State*, 92 So. 3d 676, 682 (Miss. 2012), this Court found that the admission of forensic reports through the testimony of a detective who had no hand in the production of the reports violated the Confrontation Clause, but we ultimately held that this error was harmless because the information contained in the reports bolstered the defense's case. *Id.* at 685. Presiding Justice Carlson authored a specially concurring opinion in which he agreed *in toto* with the judgment of the Court but clarified that "neither *Melendez-Diaz* nor *Bullcoming* stands for the proposition that automatic per se error – much less reversible error – occurs in all cases where the primary analyst who performed the test and prepared the report . . . fails to testify." *Id.* at 689 (Carlson, P.J., specially concurring). Then, relying on *McGowen*, Presiding Justice Carlson offered a two-pronged approach for determining whether a witness's testimony can satisfy a defendant's right to confrontation.

> First, we ask whether the witness has "intimate knowledge" of a particular
> report, even if the witness was not the primary analyst or did not perform the

10

analysis firsthand. Second, we ask whether the witness was "actively involved in the production" of the report at issue. We require a witness to be knowledgeable about both the underlying analysis and the report itself to satisfy the protections of the Confrontation Clause. If an analyst can discuss competently the analysis performed, as well as the particular document being offered – in other words, the analyst can testify live regarding the testing, methodology, and results of the analysis, rather than simply relying on the document to speak for itself – a defendant is adequately protected by the Confrontation Clause.

*Id.* at 690 (Carlson, P.J., specially concurring) (citations omitted). Seven other members of this Court concurred with Presiding Justice Carlson's opinion.

¶18. More recently, in ***Jenkins v. State*** 102 So. 3d 1063, 1069 (Miss. 2014), and ***Grim v. State***, 102 So. 3d 1073, 1081 (Miss. 2014), this Court applied ***McGowen*** and Presiding Justice Carlson's separate opinion in ***Conners*** to hold that a forensic report may be admitted through the testimony of a supervisor or technical reviewer who was directly involved in the creation of the report but did not conduct the underlying testing. ***Jenkins*** and ***Grim*** involved the possession and sale, respectively, of controlled substances, and the State admitted into evidence forensic reports indicating that the substances in question were cocaine. ***Jenkins***, 102 So. 3d at 1064; ***Grim***, 102 So. 3d at 1074. In both cases, the reports at issue were admitted through the testimony of technical reviewers, who had examined reports generated by other analysts and verified that the data supported the conclusions of the reports. ***Jenkins,*** 102 So. 3d at 1064; ***Grim v. State***, 102 So. 3d at 1074. Addressing both cases on certiorari review, this Court held that the admission of the reports did not violate the Confrontation Clause. ***Jenkins***, 102 So. 3d at 1069; ***Grim***, 102 So. 3d at 1081. On the contrary, this Court held that "[a] supervisor, reviewer, or other analyst involved may testify in place of the

11

primary analyst where that person was 'actively involved in the production of the report and had intimate knowledge of the analyses even though [he or] she did not perform the tests first hand.'" *Jenkins*, 102 So. 3d at 1069 (quoting *McGowen*, 859 So. 2d at 340); *Grim v. State*, 102 So. 3d at 1081. The testifying witnesses competently explained the testing procedures as well as the processes they used to review the initial testing. *Jenkins*, 102 So. 3d at 1069; *Grim*, 102 So. 3d at 1081. In addition, the testifying witnesses offered their own independent conclusions that the substances in question were cocaine. *Jenkins*, 102 So. 3d at 1069; *Grim*, 102 So. 3d at 1081. Accordingly, this Court affirmed the defendants' convictions.

¶19. Finally, in *Hingle v. State*, 153 So. 3d 659, 661 (Miss. 2014), another case involving the sale of a controlled substance, a drug analyst with the Mississippi Crime Laboratory offered an expert opinion that the substance sold by the defendant was morphine. *Id.* The substance had been tested by another analyst, and the testifying witness had reviewed the testing procedures. *Id.* As in the instant case, the lab report containing the test results was not admitted into evidence. *Id.* On appeal, this Court held that the analyst's testimony concerning the identity of the substance did not violate the defendant's right to confrontation. *Id.* at 665. We applied our prior holdings in *Grim* and *Jenkins*, finding that the testifying witness had personal knowledge of the testing procedures and was involved in the creation of the underlying report. *Id.* at 665. This Court concluded, "A review of the record of [the testifying witness's] testimony confirms that he answered every question posed to him on cross-examination by defense counsel and never averred that his role rendered him without the requisite knowledge to respond." *Id.*

¶20. The case *sub judice* is almost identical to ***Jenkins***, ***Grim***, and ***Hingle***. Like the witnesses in ***Jenkins*** and ***Hingle***, Gilman testified as an expert witness in the field of forensic science, with an emphasis in drug analysis. And as in each of the aforementioned cases, Gilman served as a technical reviewer for the tests performed on State Exhibit 2. Gilman testified about her role as a technical reviewer, explaining that she had reviewed the data generated by the primary analyst and had verified that the conclusions in the report were supported by that data. Gilman also offered her own opinion, based on the data generated from the testing, that the substance in State Exhibit 2 was cocaine. Finally, Gilman's initials appear on State's Exhibit 2, as well as State's Exhibits 6 and 7, as proof of her involvement in the testing procedures. These facts are in stark contrast to those presented in ***Bullcoming***, in which the testifying witness "played no role in producing the . . . report[,] . . . did not observe any portion of Caylor's conduct of the testing," and did not offer an "independent expert opinion about Bullcoming's blood alcohol concentration." ***Bullcoming***, 131 S. Ct. at 2722 (Sotomayor, J., concurring in part). Thus, under this Court's holdings in ***Jenkins***, ***Grim***, and ***Hingle***, we find that Gilman was "'actively involved in the production of the report and had intimate knowledge of the analyses even though . . . she did not perform the tests first hand.'" ***Jenkins***, 102 So. 3d at 1069 (quoting ***McGowen***, 859 So. 2d at 340. As such, her testimony did not violate Armstead's rights under the Confrontation Clause.

¶21. Armstead argues that ***Jenkins*** and ***Grim*** are contrary to clearly established federal law and should be overruled. This argument is without merit. Armstead is correct that the United States District Court for the Northern District of Mississippi recently granted Denell

13

Grim's petition for habeas corpus on the ground that *Grim* was contrary to *Melendez-Diaz* and *Bullcoming*. *Grim v. Epps*, 2015 WL 5883163, at \*1 (N.D. Miss. Oct. 8, 2015). However, on appeal, the Fifth Circuit reversed the district court's ruling and denied Grim's petition. *Grim v. Fisher*, 2016 WL 890128, at \*12 (5 Cir. Mar. 8, 2016). The Fifth Circuit held that neither *Melendez-Diaz* nor *Bullcoming* established a rule of federal law that, "when the prosecution introduces a forensic report containing a testimonial certification . . . the only witness whose in-court testimony can satisfy the Confrontation Clause is the analyst who performed the underlying analyses contained in the report." *Id.* at \*9. Other federal courts have reached the same result. *See id.* at \* 11 (citing *Flournoy v. Small*, 681 F.3d 1000, 1005 (9th Cir. 2012); *United States v. James*, 712 F.3d 79, 102 (2d Cir. 2013); *United States v. Sweeney*, 70 M.J. 296, 311 n. 13 (C.A.A.F. 2011)).

¶22. Under this Court's Confrontation-Clause precedent concerning the testimony of forensic analysts, we find that the trial court did not commit an error, much less plain error, in allowing Gilman to testify that State Exhibit 2 contained cocaine. Gilman's testimony did not result in a "manifest miscarriage of justice." *Williams*, 794 So. 2d at 187 (Miss. 2001).

**CONCLUSION**

¶23. For the foregoing reasons, we affirm Armstead's convictions and sentences.

¶24. **COUNT I: CONVICTION OF SALE OF COCAINE LESS THAN 2 GRAMS AND SENTENCE OF SIXTEEN (16) YEARS IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, AS A HABITUAL OFFENDER AND SUBSEQUENT DRUG OFFENDER, AFFIRMED. SAID SENTENCE SHALL NOT BE REDUCED OR SUSPENDED, NOR SHALL APPELLANT BE ELIGIBLE FOR PAROLE OR PROBATION, WEEKEND PASSES OR EARLY RELEASE OF ANY KIND. APPELLANT SHALL PAY A FINE IN THE AMOUNT OF $2,000. SENTENCE IN COUNT II SHALL RUN CONSECUTIVELY TO THIS SENTENCE.**

**COUNT II: CONVICTION OF SALE OF COCAINE LESS THAN 2 GRAMS AND SENTENCE OF SIXTEEN (16) YEARS IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, AS A HABITUAL OFFENDER AND SUBSEQUENT DRUG OFFENDER, AFFIRMED. SAID SENTENCE SHALL NOT BE REDUCED OR SUSPENDED, NOR SHALL APPELLANT BE ELIGIBLE FOR PAROLE OR PROBATION, WEEKEND PASSES OR EARLY RELEASE OF ANY KIND. APPELLANT SHALL PAY A FINE IN THE AMOUNT OF $2,000. SENTENCE IN COUNT II SHALL RUN CONSECUTIVELY TO THE SENTENCE IN COUNT I.**

**RANDOLPH, P.J., LAMAR, COLEMAN, MAXWELL AND BEAM, JJ., CONCUR. KITCHENS, J., CONCURS IN PART AND DISSENTS IN PART WITH SEPARATE WRITTEN OPINION JOINED BY DICKINSON, P.J., AND KING, J.**

**KITCHENS, JUSTICE, CONCURRING IN PART AND DISSENTING IN PART:**

¶25. Because Claudette Gilman, a forensic scientist with the Columbus City Police Department, personally tested both State's Exhibits 6 and 7, I agree with the majority that no violation of Perry Armstead's Sixth Amendment right to confront his accusers occurred with regard to Count 1. Nevertheless, Gilman admitted that she did not personally analyze State's Exhibit 2, with which the State proved Count 2 of Armstead's indictment. Gilman acted instead as a "technical reviewer." I dissent in part because I cannot sanction the majority's holding that the Confrontation Clause of the Sixth Amendment of the United States Constitution is satisfied by the testimony of a laboratory supervisor who merely reviewed and signed off on a forensic laboratory report, but did not personally test or observe the testing of the incriminating substance. With respect, expediency does not absolve the State of its responsibility to afford the accused the opportunity to cross-examine the accuser.

¶26. The Sixth Amendment to the United States Constitution and Article 3, Section 26, of the Mississippi Constitution guarantee the right of the accused in a criminal proceeding to

15

be confronted by the witnesses against him. In *Crawford v. Washington*, 541 U.S. 36, 61, 124 S. Ct 1354, 158 L. Ed. 2d 177 (2004), the Court found that, "[w]here testimonial statements are at issue, the only indicium of reliability sufficient to satisfy constitutional demands is the one the Constitution actually prescribes: confrontation." *Id.* at 68-69.

¶27. Forensic laboratory reports prepared specifically for trial, such as the one in this case, are among the "core class of testimonial statements" governed by the Confrontation Clause. *Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 310, 129 S. Ct 2527, 174 L. Ed. 2d 314 (2009). Therefore, the analysts who create these reports must be available for cross-examination by the accused, even if they "possessed the scientific acumen of Mme. Curie and the veracity of Mother Theresa." *Id.* at 319, n.6.

¶28. In *Bullcoming v. New Mexico*, 564 U.S. 647, 651, 131 S. Ct. 2705, 180 L. Ed. 2d 610 (2011), a plurality of the Supreme Court held that when a forensic report is admitted into evidence, "surrogate testimony" by a scientist who neither prepared nor oversaw the preparation of the report does not meet the standard under the Confrontation Clause. The Court continued: "The accused's right is to be confronted with the analyst who made the certification, unless that analyst is unavailable at trial, and the accused had an opportunity, pretrial, to cross-examine that particular scientist." *Id.* The Court stressed that, "the [Confrontation] Clause does not tolerate dispensing with confrontation simply because the court believes that questioning one witness about another's testimonial statements provides a fair enough opportunity for cross-examination." *Id.* at 662. Furthermore, the Court noted that, "[t]he text of the Sixth Amendment does not suggest any open-ended exceptions from

16

the confrontation requirement to be developed by the courts." *Id.* (quoting *Crawford*, 541 U.S. at 54).

¶29. With respect to Count 2, the majority holds that Armstead's Sixth Amendment rights were satisfied by Gilman's trial testimony. Gilman, though a self-proclaimed "technical reviewer," did not herself test the substance comprising Exhibit 2. Gilman testified as follows:

> Q. And did you analyze the exhibit [exhibit 2] to test for controlled substances?
>
> A. I personally did not.
>
> . . .
>
> Q. Now, you said earlier you weren't the analyst for this particular substance. Were you in fact the technical reviewer?
>
> A. Yes, I was.
>
> Q. Explain for the ladies and gentlemen of the jury the difference between the analyst and the technical reviewer.
>
> A. The analyst actually goes through and does those tests . . . . [Analysts] actually do those procedures on [the substances]. As a technical reviewer, I look at the data that they created from that and make sure that everything lines up with it, and it is what it is.
>
> Q. And why is it important to have a technical reviewer?
>
> A. You want all of your work checked so there's no doubt about what you've done, that you've followed each procedure throughout what you're supposed to do.
>
> Q. Essentially the testing is done, and then a technical reviewer comes back[] and double checks the tests and the results that were done?
>
> A. Yes.

17

As in ***Bullcoming***, the substitute witness did not "perform or observe the test reported in the certification," but rather merely reviewed the data contained in a report by the analyst who had conducted the testing. ***Bullcoming***, 564 U.S. at 652. Because Gilman did not personally perform or observe the performance of the tests in question, she could not be cross-examined for any "lapses or lies" in the analysis. ***Id.*** at 662.

¶30.    The forensic report in this case, similar to those admitted into evidence in ***Melendez-Diaz*** and ***Bullcoming***, was a "testimonial statement." *See **Melendez-Diaz*** 557 U.S. at 310 ("[The] substance found in petitioner's possession was, as the prosecution claimed, cocaine of a certain weight—the precise testimony the analysts would be expected to provide if called at trial."). This required that the author of the document, the analyst who actually created the report, be confronted in accordance with Armstead's rights under the Sixth Amendment. Because the document was among the "core class of testimonial statements" contemplated by ***Melendez-Diaz***, the author—not Gilman—was the witness whom Armstead had the right to confront and cross-examine. *See **Bullcoming***, 564 U.S. at 663 ("In short, when the State elected to introduce [the analyst's] certification, [the analyst] became a witness Bullcoming had the right to confront.")

¶31.    The majority attempts to distinguish this case from ***Bullcoming*** and ***Melendez-Diaz*** by stating that here, unlike in those cases, the substitute witness had *some* involvement in the production of the document. In so doing, the majority relies on ***McGowen v. State***, 859 So. 2d 320, 339 (Miss. 2003), in which this Court found that various forensic reports admitted into evidence through the testimony of a scientist who reviewed, but did not actually create,

18

the reports was not a violation of the defendant's right to confront his accuser. But *McGowen* was decided before *Crawford*, *Melendez-Diaz*, and *Bullcoming*, and therefore reliance on that case is misplaced. *See Grim v. State*, 102 So. 3d 1073, 1087 (Dickinson, P.J., dissenting).

¶32.   Further, the majority relies on *Conners v. State*, 92 So. 3d 676 (Miss. 2012), *Jenkins v. State*, 102 So. 3d 1063 (Miss. 2014), *Grim v. State,* 102 So. 3d 1073 (Miss. 2014), and *Hingle v. State*, 153 So. 3d 659 (Miss. 2014).

¶33.   In *Conners*, this Court considered whether "the admission of two forensic reports in the absence of the analysts who performed the tests violated his Sixth Amendment right to confrontation." *Conners*, 92 So. 3d at 682. On the basis of *Crawford*, *Melendez-Diaz*, and *Bullcoming*, this Court held that "the reports were inadmissible at Conners's trial absent the analysts' live testimony" and that admission thereof "violated the Confrontation Clause." *Id.* at 684. The error was deemed to have been harmless. *Id.* at 685. The first report, a firearm identification report, "did not determine that the spent shells found at the scene definitely were fired from the shotgun found at the scene." *Id.* Further, this Court found that a reasonable inference could be drawn that the spent shotgun shells, found at the scene of the crime, had been fired from the shotgun also found at the scene of the crime. *Id.* With regard to the second report, a toxicology report, this Court held any error in its admission was harmless because the report bolstered the accused's theory of defense, that drugs were forcibly introduced into his system. *Id.* at 685.

¶34.   In a specially concurring opinion, joined by a majority of this Court, Presiding Justice Carlson suggested a two-pronged analysis for satisfaction of the Confrontation Clause by a substitute witness: "First, we ask whether the witness has 'intimate knowledge' of a particular report, even if the witness was not the primary analyst or did not perform the analysis firsthand." *Id.* at 690 (citing *McGowen*, 859 So. 2d at 340) "Second, we ask *whether the witness was 'actively involved in the production' of the report at issue. . . .*" *Id.* at 690 (quoting *McGowen*, 859 So. 2d at 340) (emphasis added). While under that test it is necessary that the substitute witness have "intimate knowledge" of the report, such knowledge is not alone sufficient in the absence of active involvement in the production of the report admitted into evidence by his testimony. Gilman may have "intimate knowledge" of the forensic laboratory report for Exhibit 2. Nevertheless, her testimony makes clear that she was not "actively involved" in the report's production, but rather that she merely reviewed the data.

¶35.   In *Jenkins*, Jenkins had been stumbling down the street when a police officer stopped him to ascertain his sobriety. *Jenkins*, 102 So. 3d at 1064. During the stop, the officer noticed a tissue in Jenkins's mouth, which contained three rocks of what was later determined to be cocaine. *Id.* at 1065. In that case, the witness called to testify to the results of the analysis of the substance was not the analyst who created the report, but rather a different scientist who reviewed the report. *Id.* The majority, relying on *McGowen* as does this Court today, held that "[a] supervisor, reviewer, or other analyst involved may testify in place of the primary analyst where that person was 'actively involved in the production of

20

the report and had intimate knowledge of the analyses even though [he or] she did not perform the tests first hand.'" *Jenkins*, 102 So. 3d at 1069 (quoting *McGowen*, 859 So. 2d at 340).

¶36.   I, joined by Presiding Justice Dickinson and Justices Chandler and King, dissented, finding that this "substitute witness" did not afford the defendant an opportunity to confront the witnesses against him as guaranteed by the Confrontation Clause. *Id.* at 1072-73. I expressed the following concern:

> Although he testified at length about what Smith [the technical reviewer] "would have" done, such as "visually examin[ing] the exhibit, obtain[ing] the weight of the exhibit, obtain[ing] the sample of the exhibit, and then subject[ing] that sample to the examinations," Gross had no personal knowledge whether Smith actually did these things, and he did none of these things himself.

*Jenkins*, 102 So. 3d at 1071 (Kitchens, J., dissenting).

¶37.   Likewise in *Grim*, the defendant was convicted for the sale of cocaine after a confidential informant recorded the transaction on videotape and audio recording. *Grim*, 102 So. 3d at 1077. At trial, a forensic laboratory report was admitted into evidence through the testimony of a technical reviewer, rather than through the analyst who actually created the report. *Id.* The majority, once again relying on *McGowen*, found Grim's Sixth Amendment rights to have been satisfied:

> Frazure [the technical reviewer] was able to explain competently the types of tests that were performed and the analysis that was conducted. He had performed "procedural checks" by reviewing all of the data submitted to ensure that the data supported the conclusions contained in the report. Based on the data reviewed, Frazure had reached his own conclusion that the substance tested was cocaine. His conclusion was consistent with the report, and he had signed the report as the technical reviewer.

21

*Id.* at 1081.

¶38.   I, again joined by Presiding Justice Dickinson and Justices Chandler and King, dissented, writing that "the admission of [the analyst's] laboratory report via [the technical reviewer's testimony, without the defendant's having had a prior opportunity to cross-examine [the analyst], violated Grim's constitutional right to confrontation, thereby impairing his right to a fair trial." *Grim*, 102 So. 3d at 1082 (Kitchens, J., dissenting). "[L]ike the surrogate witness in *Bullcoming*, 131 S. Ct. at 2716, who did not 'perform or observe the test reported in the certification,' [the technical reviewer] did not observe [the analyst] conducting his analysis, and was therefore unable to provide the calibre of confrontation required by the Sixth Amendment." *Id.* at 1083.

¶39.   In *Hingle*, a confidential informant purchased a number of pills from the defendant. *Hingle*, 153 So. 3d at 661. Testing showed that the pills contained morphine. *Id.* At trial, a forensic laboratory report was admitted through the testimony of a scientist other than the analyst who had created the report. *Id.* The majority relied once again on *McGowen* to conclude that Hingle's Confrontation Clause rights were satisfied:

> [The technical reviewer's] testimony about the report was admissible because [the technical reviewer] had intimate knowledge of the testing and he was actively involved in the production of the report because he served as the reviewing analyst. His signature as the reviewing analyst was required for the report to be completed. [The technical reviewer] competently discussed the testing performed, the results of the analysis, and his role as the reviewing analyst.

*Id.* at 664.

¶40. Justice Chandler authored a dissent, joined by Presiding Justice Dickinson, by Justice King, and by me, writing that the technical reviewer "merely reviewed a report of a test generated by [the analyst], [and] lacked personal knowledge of the events of the specific test." ***Hingle***, 153 So. 3d at 670 (Chandler, J., dissenting). Justice Chandler continued:

> Certainly, [the technical reviewer] reviewed the test results, was familiar with the testing process, and was equipped to testify on whether the written report showed that the test comported with proper procedures and whether the results of the test were commensurate with the testing devices used. He testified in terms of what [the analyst] "would" have done to conduct the test, and that it appeared from the report that [the analyst's] result was correct. But he could not testify as to whether [the analyst] had received the sample intact, whether [the analyst] had dropped or mishandled the sample, or whether [the analyst] had encountered any problems with the testing equipment. Additionally, [the technical reviewer's] surrogate testimony could not "expose any lapses or lies on [the analyst's] part." [The technical reviewer's] testimony did not afford Hingle the opportunity to cross-examine the analyst who had performed or observed the test on what that analyst "knew or observed about the events his certification concerned, i.e., the particular test and testing process he employed," as required by ***Bullcoming***. I observe that the State could have satisfied the Confrontation Clause here by simply having had [the technical reviewer] retest the pills and testify about the results of the retest.

***Hingle***, 153 So. 3d at 669-70 (Chandler, J., dissenting) (citing ***Bullcoming***, 131 S. Ct. at 2718).

¶41. Today, I maintain that ***Jenkins***, ***Grim***, and ***Hingle*** "are inconsistent with the strictures of ***Bullcoming***" and "I would overrule those cases." ***Hingle***, 153 So. 3d at 670 (Chandler, J., dissenting). The application of the Confrontation Clause in criminal proceedings "'may not [be] disregard[ed] . . . at our convenience.'" ***Bullcoming***, 131 S. Ct. At 2718 (quoting ***Melendez-Diaz***, 557 U.S. at 325). Gilman's testimony did not afford Armstead an opportunity to confront the analyst who actually tested Exhibit 2. Because he was denied the

23

right to cross examine such analyst, he was not afforded the protections of the Confrontation Clause. I therefore respectfully dissent in part with regard to the admission of Gilman's testimony as to Exhibit 2.

**DICKINSON, P.J., AND KING, J., JOIN THIS OPINION.**